## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2019**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **BOBBY TUCKER,** | : | **VIOLATION:** |
| | : | |
| Defendant. | : | **18 U.S.C. § 201 201(b)(1)(A) (Bribery)** |

## INDICTMENT

The Grand Jury charges that:

## BACKGROUND

At all times material to this Indictment:

1.     Defendant BOBBY TUCKER was a consultant who operated a business that purported to help clients with matters before the District of Columbia government.

2.     The District of Columbia Office of Tax and Revenue ("OTR") was an agency of the District of Columbia government responsible for collecting taxes from individuals and businesses.

3.     Public Official A, a Revenue Officer, Bankruptcy Specialist, with OTR, was a confidential human source cooperating with the criminal investigation of TUCKER. Public Official A's duties as a Revenue Officer, Bankruptcy Specialist, included ensuring that individuals and businesses satisfied their tax obligations to the District of Columbia. As a Revenue Officer, Bankruptcy Specialist, Public Official A had the authority to develop a plan of action to resolve delinquent taxes with taxpayers and their representatives and to take enforcement actions when appropriate.

1

4.    Person B was a confidential human source cooperating with the criminal investigation who owned a business in the District of Columbia that was required to pay sales and use taxes.

## COUNT ONE
### (Bribery)

5.    The allegations contained in paragraphs 1 through 4 of this Indictment are re-alleged as if fully set forth herein.

6.    From at least in or about October 2018 to in or about December 2018, within the District of Columbia and elsewhere, the defendant BOBBY TUCKER, corruptly did give, offer, and promise things of value to Public Official A with intent to influence official acts; that is, TUCKER offered and gave Public Official A money in order to influence Public Official A to improperly reduce the tax liabilities of TUCKER's clients and to take other actions to benefit TUCKER's business as opportunities arose.

### Purpose of the Scheme

7.    It was a purpose of the bribery scheme for defendant TUCKER to pay Public Official A to reduce and eliminate the tax liabilities of TUCKER's clients and to take other actions to benefit TUCKER's business as opportunities arose.

### Manner and Means

The manner and means by which TUCKER carried out the bribery scheme included, but were not limited to, the following:

8.    In or about October 2018, Public Official A approached TUCKER and asked him if he would be interested in receiving referrals of potential clients with outstanding tax liabilities to OTR.  TUCKER responded that he was interested in such an arrangement.

9.    On or about October 31, 2018, Public Official A and TUCKER had a phone

conversation in which Public Official A offered to provide Tucker with a "referral" of an individual who had an outstanding tax liability with OTR. Public Official A told TUCKER that this individual's tax debt was "about 160," by which Public Official A meant approximately $160,000. Public Official A told TUCKER that Public Official A would provide this individual with TUCKER's contact information.

10.     On or about November 2, 2018, Person B called TUCKER and explained that Person B had been referred to TUCKER by Public Official A. Person B explained that Person B's business owed a significant tax liability to OTR and that Person B was interested in hiring TUCKER to resolve that liability. TUCKER told Person B his fee would be a $1,500 retainer plus 10% of "whatever we get off."

11.     On or about November 16, 2018, TUCKER and Public Official A had a phone conversation during which TUCKER proposed that Public Official A eliminate the penalties owed by Person B's business. Public Official A told TUCKER Public Official A would think about the proposal. Later that day, TUCKER called Person B to tell Person B that he had spoken with OTR about Person B's case and was now "awaiting a decision from them." TUCKER told Person B that he was attempting to convince OTR to enter into a settlement agreement with Person B under which OTR would eliminate the penalties and fees owed by Person B and put Person B on a payment plan of $5,000 to $5,500 per month.

12.     On or about November 29, 2018, Public Official A called TUCKER. Public Official A told TUCKER that a legitimate payment plan was "not going to get [Person B] where [Person B] want to." Public Official A then told TUCKER that Public Official A could "go around the back way" by using a false entry in the OTR system of a bankruptcy filing to eliminate Person B's entire tax liability. When he learned that Person B's tax liability would "go to zero" as a result

of Public Official A's plan, TUCKER stated that Person B was "gonna have to come up," or make a larger payment to TUCKER. TUCKER told Public Official A that he would "see what this is gonna be worth" and get back to Public Official A. Public Official A finally told Tucker that Person B's total liability to OTR would be approximately $17,206.10. TUCKER then asked Public Official A for a letter to show Person B describing the arrangement that Public Official A had proposed. Public Official A responded that Public Official A would send TUCKER a picture of the letter on Public Official A's phone to avoid using Public Official A's email. TUCKER responded, "Ok. There you go."

13.     Later that day, TUCKER called Person B. TUCKER told Person B that TUCKER had reached an agreement with OTR under which Person B would pay approximately $20,000 to resolve Person B's tax liability. TUCKER also told Person B that TUCKER's fee for brokering this agreement was $25,000. TUCKER told Person B that, under this arrangement, Person B would be paying $45,000 to resolve a tax liability of $180,000. Later in the conversation, TUCKER said to Person B, "I don't know if you realize, but I have people on the inside that I gotta take care of as well," and so it was important for Person B to get TUCKER "squared away" so that "I can keep working, not just you, but other people as well."

14.     Later that day, Public Official A sent TUCKER a text message stating, "Hey hey just checking to see if we good." TUCKER responded, "Yes. I will have the check Monday. So the date on the letter should reflect [M]onday. [T]hanks. See ya Monday." Public Official A replied, "Ok cool you got right." Public Official A then wrote, "Me," to clarify that Pubilc Offical A's earlier text meant, "You got me right." TUCKER responded, "Of course. That goes without saying."

15.     On or about December 3, 2018, TUCKER met with Person B. At that meeting,

Person B gave TUCKER a check for approximately $17,206.10 payable to OTR and $5,000 in cash as a down payment on the fee that Person B owed Tucker.  From that meeting, TUCKER went to OTR, in the District of Columbia, where he met Public Official A in the parking garage and gave Public Official A $2,000 of the $5,000 that Person B had given TUCKER.  When he gave Public Official A the $2,000, TUCKER told Public Official A, "That's two right there. I'll have more for you coming next week." Public Official A responded, "Okay and I'm going to try and get us some more people." TUCKER replied, "Please."

16.     Later that day, TUCKER sent Public Official A a text message stating, "[Person B] asked for the statement."  Public Official A then responded by sending TUCKER a text message stating, "I'll do it as soon as I get to the office 7 o'clock."

17.     On or about December 4, 2018, Public Official A, while in the District of Columbia, sent TUCKER a text message with a photograph of a Statement of Account for Person B's business. The Statement of Account read, "On December 4, 2018, the records of the Office of Tax and Revenue for the District of Columbia have been examined and it was found that the above named entity has no outstanding District of Columbia tax liability."

18.     Later that day, TUCKER sent a text message to Person B with the same Statement of Account for Person B's business. TUCKER sent a follow up text message to Person B stating, "System generated. It's all clear. And any question should come to me."

19.     On or about December 9, 2018, Person B contacted TUCKER via text message and arranged to meet with TUCKER on Tuesday, December 11, 2018, "for the second payment."

20.     On or about December 11, 2018, Person B met TUCKER in Springfield, Virginia and paid TUCKER $10,000 in cash.

21.     On or about December 13, 2018, TUCKER sent a text message to Public Official

A stating, "Hey kid. I got 3 for you and can meet Saturday halfway or I will be in town next week. Whatever works." TUCKER and Public Official A agreed to meet in Fredericksburg, Virginia on Saturday, December 15, 2018 at 1:30 PM.

22.     On or about December 17, 2018, TUCKER sent a text message to Public Official A stating, "Is there another way I can get it to you? Like 3 days at western union." TUCKER then attempted unsuccessfully to make a $3,000 Western Union wire transfer to Public Official A from a grocery store in Suffolk, Virginia.

23.     On or about December 18, 2018, TUCKER successfully made a $2,000 MoneyGram wire transfer to Public Official A from a CVS in Suffolk, Virginia. TUCKER then sent a text message to Public Official A stating, "Money Gram allowed 2 and the other one will be there tomorrow."

24.     On or about December 19, 2018, Public Official A withdrew the $2,000 MoneyGram wire transfer from a CVS in the District of Columbia.

25.     On or about December 20, 2018, TUCKER successfully made a $1,000 MoneyGram wire transfer to Public Official A from a CVS in Newport News, Virginia. TUCKER then sent a text message to Public Official A stating, "The other 1. Have a Merry CHRISTMAS." Included with the text message was a photograph of a MoneyGram receipt.

26.    On or about December 20, 2018, Public Official A withdrew the $1,000 MoneyGram wire transfer from a CVS in the District of Columbia.

**(Bribery, in violation of Title 18, United States Code, Section 201(b)(1)(A))**

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia