UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | No.: 19-CR-165 (BAH) |
| v. | |
| **BOBBY TUCKER,** | Sentencing: October 16, 2020 |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Defendant Bobby Tucker, the former Chief of Collections for the District of Columbia Office of Tax and Revenue ("OTR") paid bribes to an OTR official in exchange for that official wiping out nearly $150,000 in tax liability for a business organization that was one of Tucker's consulting clients. In arriving at a just sentence for this conduct, the government urges the Court to consider the defendant's criminal history, the very serious nature of the offense conduct, the defendant's failure to completely disclose his assets to the United States Probation Office, and his repeated violation of his conditions of pretrial release. The government respectfully requests that the Court sentence the defendant to 25 months' incarceration, a fine of $20,000, and three years' supervised release.

## BACKGROUND

On May 16, 2019, a grand jury returned a one-count Indictment charging Tucker with Bribery, in violation of 18 U.S.C. § 201. On June 12, 2020, Tucker plead guilty to the Indictment without a plea agreement with the government.

### A. Offense Conduct

Tucker's criminal conduct was as simple as it was destructive to public faith in the credibility of our governmental institutions. As described in greater detail in the Presentence

1

Investigation Report and below, Tucker made three payments totaling $5,000 to Public Official A, an OTR Revenue Officer, in exchange for Public Official A reducing the purported tax liability of Person B, a business owner and one of Tucker's consulting clients.

In October 2018, Tucker and Public Official A had a phone conversation during which Public Official A asked if Tucker would be interested in receiving referrals of individuals with outstanding tax liabilities and Tucker responded that he would.  PSR ¶12.  On October 31, 2018, Tucker and Public Official A had a phone conversation in which Public Official A offered to provide Tucker with the first such referral.  PSR ¶12.  Public Official A told Tucker that this individual's tax debt was approximately $160,000 and that Public Official A would provide this individual with Tucker's contact information.  PSR ¶12.  This business owner, Person B, contacted Tucker and agreed to Tucker's fee consisting of a $1,5000 retainer and 10% of "whatever we get off," as Tucker put it.  PSR ¶13.

In November 2018, Tucker had a series of conversations with Public Official A in which Tucker initially sought concessions from OTR in the form of the waiver of penalties and interest on Person B's tax obligation along with a monthly payment plan.  PSR ¶14.  But Public Official A advised Tucker that such a set up was "not going to get [Person B] where he want to," leading Public Official A to offer to "go around the back way" by using a false entry in the OTR system of a bankruptcy filing in order to eliminate Person B's entire tax liability.  PSR ¶15.  When he learned that Person B's tax liability would "go to zero" as a result of this plan, Tucker stated that Person B "gonna have to come up" (as in, make a larger payment to Tucker).  PSR ¶15.  Later in the conversation, Public Official A told Tucker that Person B's total liability to OTR, after this fictitious bankruptcy, would be approximately $17,000.  PSR ¶15.

Later that day, Tucker told Person B that he had reached an agreement with OTR under which Person B would pay $20,000 to resolve his tax liability and that Tucker's fee for brokering the agreement was $25,000.  PSR ¶16.  In that same conversation, Tucker said to Person B, "I don't know if you realize, but I have people on the inside that I gotta take care of as well," and so it was important for Person B to get Tucker "squared away" so that "I can keep working, not just you, but other people as well."  PSR ¶16.

In the following weeks, in a series of meetings, Tucker received $20,000 in cash from Person B and made three payments totaling $5,000 to Public Official A in cash at the OTR parking garage and via wire transfers.

### B. Tucker's Repeated Violations of His Conditions of Release

On May 22, 2019, the defendant was arrested in the Eastern District of Virginia and presented to the court in that District on the same day.  The court released the defendant with conditions including that he "have [n]o Transactions with DC Office of Taxation and Revenue." *United States v. Bobby Tucker*, 2:19-mj-00280-RJK (E.D.Va.), ECF No. 5.  On May 31, 2020, the defendant was arraigned by this Court and was released on conditions including that he have "[n]o contact with any employees with Office of Tax + Revenue."  ECF No. 9.  The defendant wasted little time in repeatedly violating this condition of his release.  Specifically, the defendant had repeated contact with Person C, then an OTR employee.[1]  Tucker and Person C exchanged scores of text messages, phone calls, and even met in person.  The government obtained and searched Person C's phone and was able to review the content of many of Tucker's text message

---

[1] Person C had been an OTR employee since 2014.  Prior to his arrest in this case, the defendant and Person C had approximately 1,000 contacts, including phone calls, text messages, and in-person meetings.  It therefore seems likely, to say the least, that Tucker knew Person C was an OTR employee.

communications with Person C. Although the communications were of a personal nature, they nonetheless constituted clear and numerous violations of the defendant's conditions of release.

### C. Failure to Disclose to the United States Probation Office

The Presentence Investigation Report reveals at least two ways in which the defendant failed to disclosed, or perhaps intentionally concealed, assets from this Court. First, Tucker reported to the USPO during the conduct of its Presentence Investigation that he is the registered owner of three vehicles: two Ford trucks and a Land Rover. PSR ¶95. But the USPO discovered through its own "[i]ndependent investigation" that Tucker also owns a Mercedes-Benz. When the USPO questioned him about his car, he stated that his son is its primary driver. PSR ¶95. Second, the USPO found that Tucker owns a home in Suffolk, Virginia that is lien free and has a fair market value of $339,627. PSR ¶95. But Tucker did not disclose to the USPO that he and his wife are the owners of a home in Fredericksburg, Virginia that as a fair market value of $372,172. PSR ¶97. When the USPO asked Tucker about the Fredericksburg property, the defendant stated that his wife holds the mortgage. PSR ¶97. But County Assessor records reflect that Tucker is a joint owner of the property and, according to Tucker's 2017 and 2018 tax returns, he and his wife earned annual rental income of over $20,000 in 2017. PSR ¶97.

Tucker also seems to have sought to frustrate the USPO's efforts to learn about his financial condition by failing to "provide documentation of his assets as requested by the Probation Office. PSR ¶94. The PSR further suggests Tucker may have failed to disclose income on his 2018 federal income taxes. In that filing, Tucker and his wife reported wages of $4,503, but that was the year in which Tucker had received $20,000 from Person B in the above-described bribery scheme.

The USPO concluded that Tucker has not demonstrated an inability to pay a fine within the Guidelines. PSR ¶105. That conclusion, along with the above-listed assets which were not

disclosed to the USPO during the presentence investigation, raise questions about what was disclosed to the Court in Tucker's Financial Affidavit in Support of Request for Attorney Without Payment of Fee, ECF No. 10, to which the government does not have access.

## SENTENCING CALCULATION

### A. Statutory Maximum Sentence

For the single count of Bribery to which Tucker has pled guilty, he faces a maximum sentence of five years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

### B. Sentencing Guidelines

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guideline range." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *id.* at 46, and are the "starting point and the initial benchmark," *id.* at 49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *Rita v. United States*, 551 U.S. 338, 348-49 (2007).

The Presentence Investigation Report ("PSR") places Tucker's total offense level at 17 and calculates his criminal history as Category I. The Guideline range for a total offense level of 17 and a criminal history of Category I is 24 to 30 months of imprisonment and a fine of $10,000 to $95,000.

# ANALYSIS

Based on the factors set forth in § 3553(a), the Government recommends that this Court sentence Tucker to 25 months' imprisonment, a three-year period of supervised release, and a fine of $20,000.

This Court must consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;  (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### A. The Serious Nature of Tucker's Conduct

Tucker engaged in a scheme to enrich himself at the expense of District of Columbia taxpayers. To effectuate this scheme, Tucker made a series of payments to an OTR official, thereby harming this public institution and the public's confidence in those who ostensibly work for the public good. Tucker's scheme was far from a momentary or short-lived lapse in judgment but spanned several months and involved a series of phone calls, text messages, and financial transactions.  He had ample time to reflect on the wrongfulness of his course of conduct and, rather than put an end to his scheme, chose to continue to enrich himself at the taxpayers he had served

for many years while a senior official OTR. In fact, in the course of his criminal conduct Tucker evidenced his desire to continue to engage in similar schemes.  *See* PSR  ¶16 (Tucker told Person B he had people "on the inside" he had to "take care of" so he could "keep working, not just for [Person B], but other people as well").

The circumstances of the offense also evidence the absence of any mitigating circumstances of the defendant's criminal conduct. The defendant did not bribe a public official out of selfless concerns or imminent needs. Instead, the defendant broke the law out of greed and a desire to spend his ill-gotten funds in whatever manner he chose.  The defendant's crime falls squarely within the class of cases to which the applicable Guidelines are addressed. Thus, consideration of the nature and circumstances of the offense favors a sentence within the advisory Guidelines range.

### B. Tucker's Personal Characteristics

"In choosing the term of imprisonment within the guideline range, courts may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."  U.S.S.G. § 1B1.4.  Indeed, Congress has instructed that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661; *see also Pepper v. United States*, 562 U.S. 476, 489 (2011) (quoting *United States* v. *Tucker*, 404 U.S. 443, 446 (1972)) ("Both Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come'").

As described in the PSR, the defendant's younger years were marked by the commission of a number of serious criminal offenses, the abuse of controlled substances and alcohol. From the age of 18 to 29, the defendant was convicted of Grand Theft (on two separate occasions), Uttering, Receiving Stolen Property, and Robbery. In 2000, when he was 44, the defendant was convicted of Assault and Battery of a Highly Aggravated Nature. During periods of incarceration, Tucker obtained his GED and even took college courses. According to Tucker, he earned an undergraduate degree as well as a Masters of Business Administration. He then led what appears to have been a successful career with the District of Columbia government, culminating in his service for over seven years as the Chief of Collections for OTR.

### C. The Recommended Sentence is Consistent with the Need for the Sentence Imposed (A) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (B) to Afford Adequate Deterrence; and (C) to Protect the Public from Further Crimes of the Defendant.

The recommended sentence is appropriate to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). The defendant's offense spanned several months and sought to deprive taxpayers of the District of Columbia with the tax revenues to which they were entitled. His punishment must also deter others from engaging in similar bribery of public officials. The defendant's sentence, therefore, should serve to deter the defendant from future criminal conduct and warn others considering a corrupt path that the criminal law will deal harshly with those seeking to enrich themselves by bribing public officials. The question, in the government's view, is not whether incarceration is appropriate, but rather how much incarceration time is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The government believes that the

various factors in this case – in particular, the bribery of a public official, the defendant's position as a former senior official at OTR, his repeated violations of his conditions of release, and his failure to disclose significant assets from this Court, juxtaposed with the defendant's acceptance of responsibility and other considerations – all suggest that a sentence of 25 months of imprisonment and a fine of $20,000 is appropriate.

## CONCLUSION

For all the foregoing reasons, the appropriate considerations of sentencing favor the imposition of a sentence of 25 months' imprisonment, a fine of $20,000, and three years' supervised release.  The government also respectfully suggests that the Court review the defendant's Financial Affidavit in Support of Request for Attorney Without Payment of Fee, ECF No. 10, and consider whether, in light of the information about the defendant's financial condition uncovered by the USPO, the Affidavit was accurate.

       Respectfully submitted,

       MICHAEL SHERWIN
       ACTING UNITED STATES ATTORNEY


By: _____/s/_____
    Peter C. Lallas
    N.Y. Bar No. 4290623
    Assistant United States Attorney
    555 4th Street NW
    Washington, D.C. 20530
    (202) 252-6879
    Peter.Lallas@usdoj.gov